Mitra KOOHI; Iman Koohi, minor daughter; Kosar Koohi, minor daughter; Hassan Almassi; Iran Air Flight 655, Plaintiffs–Appellants,

v.

UNITED STATES of America; United States Department of Navy, Defendants–Appellees.

Elizabeth H. BAILEY, as the personal representative, et al., Plaintiffs–Appellants,

v.

VARIAN ASSOCIATES, INC.; General Electric Co.; GE Aerospace; RCA Corp; Harnischfeger Industries; Syscon Corp.; Computer Sciences Corporation; John Connor, Defendants–Appellees.

Nos. 90–16107, 90–16159.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 1992.

Decided Oct. 8, 1992.

Bruce A. Bailey, Burlingame, Cal., for plaintiffs-appellants.

Jeffrey Clair, U.S. Dept. of Justice, Washington, D.C., and Matthew D. Powers, Orrick, Herrington & Sutcliffe, San Francisco, Cal., for defendants-appellees.

Robert W. Hallock, James K. Meguerian, D'Ancona & Pflaum, Chicago, Ill., for Syscon Corp.

Before: SCHROEDER, REINHARDT, and KLEINFELD, Circuit Judges.

REINHARDT, Circuit Judge:

The tragedy that gives rise to this lawsuit—the shooting down of a civilian aircraft by a United States warship—occurred

in the midst of the undeclared "tanker war" that was a part of the larger hostilities between the nations of Iran and Iraq. During the tanker war, each of those nations attacked vessels carrying the other's oil. In August, 1986, Iran began to concentrate its attacks on ships calling at Kuwaiti ports, especially those flying the Kuwaiti flag. Those ships, according to Iran, were carrying Iraqi-produced cargo, primarily oil, as well as cargo destined for Iraq. Kuwait appealed to the United States for help in protecting its shipping.[1]

In March of 1987, the United States announced that it would allow qualifying Kuwaiti tankers to reregister under the American flag and that the United States Navy would then provide those tankers with protection. Because at that time Kuwait was closely allied with Iraq, the decision had the effect of aiding Iraq in its war with Iran. Shortly after the March announcement, American naval forces commenced protecting ships carrying Iraqi oil and products destined for Iraq against attacks by Iranian forces. Not surprisingly, the United States Navy soon began to engage in combat with Iranian naval vessels. We will mention only a few of the more publicized incidents. On September 21, 1987, two United States naval helicopters fired on an Iranian landing craft, disabling the craft and killing some of the crew. On October 8, Iranian gunboats fired on a United States naval helicopter; subsequently, United States naval forces destroyed one of the gunboats. On October 16, United States naval forces destroyed an Iranian oil platform. On April 14, 1988, a

United States guided missile frigate struck a mine and was extensively damaged. In apparent retaliation, United States warships destroyed three Iranian oil platforms and sank or damaged six Iranian naval vessels.

The incident that underlies this lawsuit occurred on July 3, 1988. Early that morning, the USS Vincennes, a naval cruiser equipped with the computerized Aegis air defense system, dispatched a reconnaissance helicopter to investigate reported activity by Iranian gunboats. The helicopter was allegedly fired upon by antiaircraft guns. The Vincennes in turn crossed into Iranian territorial waters and fired upon the gunboats. Minutes later, a civilian Iranian Airbus, Iran Air Flight 655, took off from a joint commercial-military airport at Bandar Abbas, Iran. The Vincennes was in the vicinity of the aircraft's flight path. Its crew mistook the civilian aircraft for an Iranian F-14 and shot it down over the Persian Gulf. All 290 persons aboard the Iranian Airbus died.[2]

Plaintiffs are the heirs of some of the deceased passengers and crew. They seek compensation from the United States and several private companies involved in the construction of the Aegis Air Defense System, which was deployed on the Vincennes. They assert two different types of claims: claims against the United States for the negligent operation of the Vincennes and claims against the weapons manufacturers for design defects in the Aegis system. Essentially, they contend that the defendants were, for differing reasons and to

---

**1.** We note that the basic events surrounding the Iran–Iraq conflict and the "tanker war" are a matter of historical record, are supported by documentation in the district court record, and are—to the extent that they are relevant to the outcome of the case before us—beyond reasonable dispute. Accordingly, we may take judicial notice of them. *See* 9 Wright & Miller, *Federal Practice and Procedure* § 2410 (1971 and 1992 supp.). The United States invites us also to take judicial notice of former Secretary of Defense Casper Weinberger's *A Report to the Congress on Security Arrangements in the Persian Gulf* (June 15, 1987). We decline that invitation.

**2.** Briefs recently filed by the Department of Justice in the International Court of Justice re-

port that the Vincennes was in Iranian waters at the time of the incident. Certain other events preceding the downing of the Iranian civilian plane remain the subject of controversy. Official government reports state the facts in the manner described in the text. Other sources suggest that the U.S. Navy deliberately provoked the conflict with the gunboats in order to create an opportunity to destroy Iran's remaining naval forces.

The outcome of this case is not affected by the truth of these matters. The result would be the same regardless of which side precipitated the naval encounter, and regardless of the Vincennes' location when it shot down the civilian plane.

differing degrees, each responsible for the misidentification of the civilian Airbus as an F–14 and the consequent decision to shoot it down. They contend that various statutes impose liability on the defendants. Following the district court's dismissal of their lawsuits, the plaintiffs appealed. We affirm.

### Justiciability

■■■■ The defendants first contend that we may not take cognizance of the plaintiffs' action because it is not justiciable. Specifically, the defendants contend that the subject of the plaintiffs' action is a "political question" beyond the power of the federal courts. *See, generally, Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). The political question doctrine serves to prevent the federal courts from intruding unduly on certain policy choices and value judgments that are constitutionally committed to Congress or the executive branch. *See Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). The determination of whether a lawsuit raises a political question depends upon "a discriminating analysis of the question posed, in terms of the history of its management by the political branches, of its susceptibility in the light of its nature and posture of the specific case, and of the possible consequences of judicial action." *Baker,* 369 U.S. at 211–12, 82 S.Ct. at 707.

We do not believe that the plaintiffs' action should be dismissed on the basis of the political question doctrine. We note, as an initial matter, that governmental operations are a traditional subject of damage actions in the federal courts. *See, e.g., Rayonier, Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) (negligence in fighting fires); *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (negligence in operating and maintaining a lighthouse). Thus, the federal courts have previously allowed damage actions alleging the negligent operation of naval vessels. *See, e.g., United States v. United Continental Tuna Corp.,* 425 U.S. 164, 181–82, 96 S.Ct.

1319, 1329, 47 L.Ed.2d 653 (1976) (holding that a suit alleging that a naval vessel negligently collided with a merchant ship may be brought against the United States if it satisfies the reciprocity requirements of the Public Vessels Act); *United States v. Lawter,* 219 F.2d 559 (5th Cir.1955) (allowing suit for negligence during operation of an at-sea rescue); *cf. United Air Lines, Inc. v. Wiener,* 335 F.2d 379, 392–95 (9th Cir.) (allowing suit for aeronautic disaster arising from negligence during military training mission), *cert. dismissed,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964). Accordingly, the fact that the plaintiffs' lawsuit involves the operation of a United States warship does not render it beyond judicial cognizance.

■■■■ Nor is the lawsuit rendered judicially unmanageable because the challenged conduct took place as part of an authorized military operation. The Supreme Court has made clear that the federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians. The controlling case is *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900). That case involved the seizure of two Spanish fishing vessels by United States naval forces engaged in a military blockade during the Spanish–American War. The Supreme Court found that the question whether the seizure of the vessels was militarily justified could be reviewed by the Court. *See id.* at 686–713, 20 S.Ct. at 294–304. The Court then held that the decision to seize the vessels was not justified by military necessity and that the vessels must be returned. *See id.* at 713–14, 20 S.Ct. at 304–05. More recently, in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Court allowed a civil action alleging the unlawful operation of the national guard during the incident at Kent State, *see id.* at 247–49, 94 S.Ct. at 1692–93. These cases make clear that the claim of military necessity will not, without more, shield governmental operations from judicial review. Instead, as the Court has stated, "when presented with claims of judicially cognizable injury resulting from military

intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury." *Laird v. Tatum,* 408 U.S. 1, 15–16, 92 S.Ct. 2318, 2327, 33 L.Ed.2d 154 (1972). As *The Paquete Habana* demonstrates, this is true in time of war as well as in time of peace, and with respect to claims by enemy civilians as well as by Americans.

A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions. *Compare Gilligan v. Morgan,* 413 U.S. 1, 11, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973) (refusing to take cognizance of a suit seeking judicial supervision of the operation and training of the Ohio National Guard in the wake of the Kent State shootings) *with id.* at 5, 93 S.Ct. at 2443 (suggesting that the court might allow a suit against the national guard for damages) *and Scheuer,* 416 U.S. at 247–49, 94 S.Ct. at 1692–93 (allowing such a suit). In sum, the federal courts are competent to determine both the merits of the plaintiffs' suit and the extent of the relief to which plaintiffs would be entitled.

In addition, because the plaintiffs seek only damages, the granting of relief will not draw the federal courts into conflict with the executive branch. Damage actions are particularly nonintrusive. *See Fair Assessment in Real Estate Ass'n v. McNary,* 454 U.S. 100, 120–21, 102 S.Ct. 177, 188–89, 70 L.Ed.2d 271 (1981) (Brennan, J., concurring in the judgment) ("There is little room for the 'principle of comity' in actions at law where, apart from

matters of administration, judicial discretion is at a minimum."). For example, while federal courts are restrained from enjoining on-going state criminal proceedings, *see Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), there is no such restraint on federal damage actions arising from state criminal proceedings, *see Giulini v. Blessing,* 654 F.2d 189, 193 (2d Cir.1981). As the Supreme Court has noted, "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 395, 91 S.Ct. 1999, 2004, 29 L.Ed.2d 619 (1971).

In sum, we hold that the plaintiffs' action against the United States is justiciable. The Supreme Court's review in *The Paquete Habana* of the Navy's decision to seize two enemy fishing vessels in the course of a military operation makes it clear that the fact that an action is "taken in the ordinary exercise of discretion in the conduct of war" does not put it beyond the judicial power. 175 U.S. at 715, 20 S.Ct. at 305 (Fuller, C.J., dissenting).[3] Because we have the power to entertain the plaintiffs' action, we must next determine whether Congress has authorized us to exercise it in the type of case before us.

### *Sovereign Immunity*

 As a general matter, the federal courts may not entertain an action against the federal government without its consent. *See, e.g., United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). The United States has consented to be sued in a number of different enactments, two of which are relevant to the instant case—the Federal Torts Claims Act (FTCA), 28 U.S.C. § 1346(b), and the Public Vessels Act (PVA), 46 U.S.C.App. § 781 et seq.[4] We have juris-

---

**3.** As we find that the plaintiffs' action against the governmental authorities is justiciable under the political question doctrine, it follows *a fortiori* that the action against the private defendants is as well. Indeed, we have found no Supreme Court or Court of Appeals decisions which have dismissed a suit brought against a private party on the basis of the political question doctrine.

**4.** The plaintiffs also bring suit under the Alien Tort Act, 28 U.S.C. § 1350, the International Civil Aviation Organization Convention, the general federal admiralty jurisdiction, 28 U.S.C. § 1333, the Death on the High Seas Act, 46 U.S.C.App. § 761 *et seq.,* and the Suits in Admiralty Act, 46 U.S.C.App. § 741 *et seq.* Of these, however, only the Suits in Admiralty Act consti-

diction over the plaintiffs' claims against the United States only if a waiver provided by the FTCA or the PVA is applicable.

■ We conclude that neither act provides a waiver of sovereign immunity for the plaintiffs' action. The waiver of sovereign immunity enacted in the FTCA contains an explicit exception for "[a]ny claim arising out of combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). We believe that exception applies here and that a similar exception must be implied in the PVA despite the absence of comparable statutory language.

There is one serious question with regard to the application of the FTCA's combatant activities exception to this case—whether or not the actions of the Vincennes took place during "time of war." [5] The leading Ninth Circuit case on the matter, *Johnson v. United States*, suggests that the words of the exception "mean exactly what they say" so that proper construction of the exception "does not require resort to all possible refinements of technical legal linguistics." 170 F.2d at 769. We do not find this analysis particularly helpful; as Justice Frankfurter has noted, "[t]he notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification." *United States v. Monia*, 317 U.S. 424, 431, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1943) (Frankfurter, J., dissenting); *see also Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1453 (9th Cir.1992) ("Statutory construction is an

area in which absolutist rules do not lead to sensible or accurate results.... Common sense not dogma is what is needed in order to explore the actual meaning of legislative enactments."); *Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir.1944) (L. Hand, concurring) ("There is no surer way to misread any document than to read it literally."), *aff'd*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). Here, although the words "time of war" may mean exactly what they say, that meaning remains unclear. *See* Note, *The Federal Tort Claims Act*, 56 Yale L.J. 534, 548 n. 99 (1947) (suggesting that the term "time of war" was recognized to be uncertain at the time of the enactment of the statute and that the phrase "combatant activities" was included in order to help shape the content of the exception).

■ In *Johnson*, we declined to construe the term "time of war." *See* 170 F.2d at 770. Here, we must do so; we employ the normal tools of our trade—reason and judgment. While our task is made considerably more difficult by the absence of legislative history, *see Johnson v. United States*, 170 F.2d 767, 769 (9th Cir.1948) (noting that the legislative history of the exceptions to the FTCA are "singularly barren of Congressional observation apposite to the specific purpose of each exception"), our analysis leads us to a clear and definitive result. We agree with those courts that have found the term not to require an express declaration of war. *See*

---

tutes a waiver of sovereign immunity. *See Canadian Transport Co. v. United States*, 663 F.2d 1081, 1092 (D.C.Cir.1980) (Alien Tort Act does not waive sovereign immunity); *Roberts v. United States*, 498 F.2d 520, 525 n. 8 (9th Cir.) (same for Death on the High Seas Act) *cert. denied*, 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974). The Suits in Admiralty Act is not applicable to suits involving public vessels, *see United States v. United Continental Tuna Corp.*, 425 U.S. 164, 169, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976), for which the Public Vessels Act was enacted. Accordingly, the two relevant statutory bases for the claims against the United States are the Federal Torts Claims Act and the Public Vessels Act.

5. It is clear that the operations conducted by the Vincennes are "combatant activities." In *John-*

son *v. United States*, 170 F.2d 767 (9th Cir.1948), we stated that the term "combatant activities" includes "not only physical violence, but activities both necessary to and in direct connection with actual hostilities," *id.* at 770. The conduct of the Vincennes that forms the subject of the plaintiffs' lawsuit is that involving the tracking, identification, and destruction of unidentified aircraft that appear to pose a threat to the warship's safety. The firing of a missile in perceived self-defense is a quintessential combatant activity. *See id.* ("[T]o swing the sword of battle is certainly a 'combatant activity.' "). The tracking and attempted identification of an unidentified and apparently threatening aircraft is a necessary adjunct of the power of self-defense. Thus, under *Johnson*, those activities also qualify as "combatant activities."

*Vogelaar v. United States,* 665 F.Supp. 1295, 1302 (E.D.Mich.1987); *Rotko v. Abrams,* 338 F.Supp. 46, 47 (D.Conn.1971), aff'd, 455 F.2d 992 (2d Cir.1972); *Morrison v. United States,* 316 F.Supp. 78, 79 (M.D.Ga.1970).

The problem we face arises from the fact that the power to declare war is vested in the Congress, *see* U.S. Const. art. I, section 8, cl. 11. Here, the Congress did not exercise that power. The question, then, is: may we nevertheless conclude, for purposes of the FTCA, that a "time of war" exists? We are strongly influenced by the fact that in modern times hostilities have occurred without a formal declaration of war far more frequently than following a formal pronouncement. No formal declaration occurred at the time of the Korean war. That war was officially called a "police action." Church, *History and the Constitutional Role of Courts, 1990 Wisconsin L.R.* 1071, 1097 n. 85 (1990). The war in Vietnam was waged with no more than a Congressional resolution. *See* Vance, *Striking the Balance: Congress and the President under the War Powers Resolution, 133 U. Pennsylvania L.R.* 79, 80 (1984). Our invasions of Panama and Grenada were undertaken by the Chief Executive on his own initiative. *See* Trimble, *The Constitutional Common Law of Treaty Interpretation, 137 U. Pennsylvania L.R.* 1461, 1474 (1989); Firmage and Wrona, *The War Power,* 59 George Washington Law Review 1684, 1700–01 (1991). Perhaps more surprising, there was no formal declaration of war prior to the "liberation" of Kuwait or the invasion of Iraq; in fact, the word "war" is notably absent from the Iraq Resolution except in subsection 2(c), where it appears only in the title of the War Powers Resolution. *See* J. Sidak, *To Declare War, 41 Duke L.J.* 27, 46–48 (1991); Pub.L.No. 102–1, 105 Stat. 3 (1991), reprinted in 137 Cong.Rec. S403–04 (daily ed. Jan. 12, 1991). Moreover, the Iraq Resolution was passed only after the President publicly asserted that he did not need congressional authorization to attack that nation. *See, e.g.,* Sidak, 41 Duke L.J. at 43 and n. 75. Yet no one can doubt that a state of war existed when our armed forces marched first into Kuwait and then into Iraq. Accordingly, the fact that our participation in the tanker war was not supported by a formal declaration of war is in no way inconsistent with the conclusion that a state of war or "time of war" existed.

We do not express any view concerning the constitutionality of acts of war by American armed forces in the absence of a formal declaration of war. We simply note that such acts have occurred with regularity in recent years, and that from a practical standpoint "time of war" has come to mean periods of significant armed conflict rather than times governed by formal declarations of war. Since neither the text nor the legislative history of the FTCA expressly states whether Congress intended the combatant activities exception to apply to undeclared conflicts, we must arrive at our conclusion primarily through the use of those techniques to which we have previously adverted—reason and judgment. Here, that process leads us, inexorably, to construe the exception in light of contemporary realities. By giving the term "time of war" its full current meaning rather than a crabbed, artificial, or technical reading we make common sense out of unclear words and best effectuate the purposes of the statute: we shield the government from the type of liability it never intended to assume.

It seems clear that the purpose of the exception we are construing is to ensure that the government will not be liable for negligent conduct by our armed forces in times of combat. Whether that combat is formally authorized by the Congress or follows less formal actions of the Executive and Legislative branches would seem to be irrelevant to Congress's objectives. We perceive three principal reasons for the combatant activities exception. First, tort law is based in part on the theory that the prospect of liability makes the actor more careful. *See, e.g.,* O.W. Holmes, Jr., *The Common Law* 31–33 (M.D. Howe ed. 1963); G. Calabresi, *The Costs of Accidents* (1970). Here, Congress certainly did not want our military personnel to exercise

great caution at a time when bold and imaginative measures might be necessary to overcome enemy forces; nor did it want our soldiers, sailors, or airmen to be concerned about the possibility of tort liability when making life or death decisions in the midst of combat. Second, tort law is based in part on a desire to secure justice—to provide a remedy for the innocent victim of wrongful conduct. *See, e.g., Restatement (Second) of Torts* § 901 (1965). War produces innumerable innocent victims of harmful conduct—on all sides. It would make little sense to single out for special compensation a few of these persons—usually enemy citizens—on the basis that they have suffered from the negligence of our military forces rather than from the overwhelming and pervasive violence which each side intentionally inflicts on the other. Third, there is a punitive aspect to tort law. *See id.* Society believes tortfeasors should suffer for their sins. It is unlikely that there are many Americans who would favor punishing our servicemen for injuring members of the enemy military or civilian population as a result of actions taken in order to preserve their own lives and limbs. For these and other reasons, tort law, in toto, is an inappropriate subject for injection into the area of military engagements. The FTCA clearly recognizes this principle, and we see no reason why Congress would want to differentiate in this respect between declared and undeclared wars.

In sum, we have no difficulty in concluding that when, as a result of a deliberate decision by the executive branch, United States armed forces engage in an organized series of hostile encounters on a significant scale with the military forces of another nation, the FTCA exception applies. Under those circumstances, a "time of war" exists, at least for purposes of domestic tort law.

There can be no doubt that during the "tanker war" a "time of war" existed. The United States' involvement in naval combat while the Iran–Iraq war was in progress was the result of a deliberate decision on the part of the executive branch to engage in hostile military activities vis-a-vis Iran in order to protect Gulf shipping. Our activi-

ties included not only the defense of reflagged tankers servicing Iraq's needs, but ultimately attacks upon Iranian gunboats and oil platforms. The Vincennes' actions constituted a part of our military involvement in the Persian Gulf. The act of shooting down the Iranian civilian aircraft, although a result of tragic error, was committed in order to further the perceived interests of the United States in its involvement in the tanker war. Moreover, we believe that the ill-fated Iranian Airbus may fairly be said to have been operating "during time of war" both temporally and spatially. The aircraft took off from an Iranian airport used for both civilian and military purposes. Its flight path was in the general area in which hostilities had occurred with regularity over the past year. The United States had issued warnings to all aircraft operations in the region notifying them of the dangers. The pilots of the Iranian aircraft should not have been surprised to encounter conditions of "war". Under the circumstances, we believe that the shooting down of the Airbus by the Vincennes falls within the FTCA's exception for combatant activities during time of war. Accordingly, the plaintiffs' FTCA action against the Vincennes is barred by the doctrine of sovereign immunity.

■ The result would be no different if the downing of the civilian plane had been deliberate rather than the result of error. The combatant activities exception applies whether U.S. military forces hit a prescribed or an unintended target, whether those selecting the target act wisely or foolishly, whether the missiles we employ turn out to be "smart" or dumb, whether the target we choose performs the function we believe it does or whether our choice of an object for destruction is a result of error or miscalculation. In other words, it simply does not matter for purposes of the "time of war" exception whether the military makes or executes its decisions carefully or negligently, properly or improperly. It is the nature of the act and not the manner of its performance that counts. Thus, for purposes of liability under the

FTCA, it is of no significance whether a plane that is shot down is civilian or military, so long as the person giving the order or firing the weapon does so for the purpose of furthering our military objectives or of defending lives, property, or other interests. To put it in the terms of the statute, the only question that need be answered is whether the challenged action constituted combatant activity during time of war.[6]

■ We now turn to the plaintiffs' action under the PVA. Unlike the FTCA, the PVA contains few express exceptions, and it does not contain an analog to the FTCA's combatant activities exception. There is precedent, however, for incorporating an FTCA exception into the PVA. *See B & F Trawlers, Inc. v. United States*, 841 F.2d 626, 628–29, 632 (5th Cir.1988) (incorporating the discretionary function exception into the PVA but refusing to incorporate the law enforcement exception); *see also Canadian Transport Co. v. United States*, 663 F.2d 1081, 1086 (D.C.Cir.1980) (incorporating the discretionary function exception into the Suits in Admiralty Act). Incorporation of the combatant activities exception into the PVA is particularly appropriate.

The FTCA's combatant activities exception specifically covers activities of naval and Coast Guard vessels. Unless a similar exception is read into the PVA, this specification will be rendered nearly meaningless. The FTCA and the PVA are mutually exclusive, *see* 28 U.S.C. § 2680(d), with only the latter providing a jurisdictional basis for tort suits arising from United States activities that "bear a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). As a result, it is far more likely that tort actions arising from the activities of naval and Coast Guard

vessels will be brought under the PVA than the FTCA. Therefore, if Congress's manifest intent to maintain sovereign immunity from liability arising from the combatant activities of maritime vessels is to be given meaningful effect, the combatant activities exception must be incorporated into the PVA. We therefore hold that the waiver of sovereign immunity established by the PVA, like that established by the FTCA, contains an exception for combatant activities during time of war. Accordingly, the plaintiffs' PVA action fails for the same reason as does their FTCA action.

### *Defense Contractors*

■ The plaintiffs' action against the Aegis manufacturers is not barred by sovereign immunity. Private parties are not entitled to such a defense. However, the Supreme Court has recognized that the exceptions to the FTCA may preempt common law tort actions against defense contractors under certain circumstances. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 511, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988). We have also previously held that those exceptions may preempt federal statutory tort actions. *See McKay v. Rockwell Int'l Corp.*, 704 F.2d 444 (9th Cir.1983) (holding that the discretionary function exception to the FTCA preempts an action against defense contractors brought under the Death on the High Seas Act, 46 U.S.C.App. § 761 *et seq.) cert. denied*, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). Thus, we must determine whether the plaintiffs' action against the Aegis manufacturers is preempted by the "combatant activities" exception.

■ We hold that it is. We have previously suggested that the combatant activities exception would shield from liability those who supply ammunition to fighting vessels in a combat area. *See Johnson,*

---

**6.** As we suggested in n. 2, *supra,* it also does not matter who is the aggressor or who is the innocent party, either with respect to the initiation of an overall conflict or with respect to a specific incident. Thus, the merits of the Iran–Iraq war, of the tanker war, and of our involvement in the Gulf dispute are of no relevance here; nor is the cause, proximate or otherwise, of the

decision to shoot down the Airbus. However, if the decision to shoot down the Airbus had been made with full knowledge of the aircraft's civilian status, the basis for our holding that plaintiffs' action against the defense contractors fails would be different: under such circumstances, there would be no basis at all for a negligence claim against those defendants.

170 F.2d at 770. A similar logic would seem to shield those who supply a vessel's weapons. The reason, we believe, is that one purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action. While the purpose of the Aegis system may have been, in part, to protect the lives of United States servicemen, its purpose surely was not to protect the lives of enemy forces or persons associated with those forces. Neither the United States nor its defense contractors owed any duty to such individuals. Because the Iranian Airbus took off from an Iranian joint commercial-military airport, was flying in the area of a combat zone, and failed to communicate its civilian status to the crew of the Vincennes, the direction of force against the aircraft by United States naval forces cannot give rise to tort liability. The imposition of such liability on the manufacturers of the Aegis would create a duty of care where the combatant activities exception is intended to ensure that none exists. Accordingly, preemption is appropriate. *See Boyle,* 487 U.S. at 511, 108 S.Ct. at 2518 (preemption appropriate when imposition of liability on defense contractor "will produce same effect sought to be avoided by the FTCA exception").

### Conclusion

We hold that the plaintiffs' action against the United States is barred by sovereign immunity and that their action against the Aegis manufacturers is preempted by federal law. Accordingly, the district court's orders dismissing the actions with prejudice are affirmed.

AFFIRMED.

KLEINFELD, Circuit Judge, concurring:

I concur in the result.

We probably can avoid resolving a constitutional issue, whether we lack jurisdiction under the political question doctrine, because sovereign immunity makes the case insubstantial on the merits. *Clow v. U.S. Department of Housing and Urban De-*velopment, 948 F.2d 614, 616 (9th Cir. 1991). Both political question doctrine and sovereign immunity go to jurisdiction. *Rivera v. United States,* 924 F.2d 948, 951 (9th Cir.1991). If it were necessary to reach it, I would conclude that we have no jurisdiction under the political question doctrine.

We flew the American flag on foreign vessels to protect shipping in the Persian Gulf during the Iran–Iraq war. An Iraqi warplane had successfully fired missiles at an American warship, the U.S.S. Stark. After more than a year of violent naval and air encounters, the Iranian passenger airplane took off during an exchange of fire between American and Iranian gunboats. The commander of the Vincennes had to decide, in the heat of battle, whether to risk his sailors and his ship on the unidentified approaching plane. The United States paid money to the airplane passengers' estates, but made a point, for foreign policy purposes, of not acknowledging any wrongdoing.

The means and methods of making war are assigned to the executive branch by Article II, Section 2 of the Constitution. Every one of the reasons for treating a question as outside our jurisdiction under the political question doctrine, listed in *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), applies here. *Baker v. Carr* teaches that foreign relations and determination of when or whether a war has ended, illustrate areas of application of the doctrine. *Id.* at 211–13, 82 S.Ct. at 706–08; *see Sarnoff v. Connally,* 457 F.2d 809 (9th Cir.), *cert. denied sub nom. Sarnoff v. Schultz,* 409 U.S. 929, 93 S.Ct. 227, 34 L.Ed.2d 186 (1972). The Federalist Papers, explaining why the Constitution makes the President commander in chief, says, "Of all the cares or concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand." The Federalist No. 74 (Hamilton), Cooke ed. at 500 (1788).

The authorities upon which the majority relies do not extend federal court jurisdiction to questions of how we fight in com-

bat. *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), did not raise the issue of justiciability. The executive branch filed the libel in admiralty, to obtain an adjudication of title, so the court had no occasion to adjudicate whether the executive branch was entitled to avoid a judicial determination. The President had made an executive determination that the Spanish–American War was to be conducted according to international law, so the only question before the court was whether under international law title to non-combatant fishing boats could pass under the doctrine of war prizes. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) resolved the scope of immunity from damage suits of state officials under the Eleventh Amendment and common law tort doctrine. It did not address whether the federal courts can adjudicate questions arising out of the federal executive's conduct in firing weapons at putative attackers during combat.

The phrase "time of war" in the Federal Tort Claims Act is ambiguous, so a literal construction cannot determine the scope of the exception. Does it mean a time during which Congress has declared war, or a time during which the military forces of the United States are engaged in the use of arms? If the former, the exception does not apply. If the latter, it does. The latter is a more reasonable interpretation. Congress probably did not intend that the government be liable for failure to exercise reasonable care for the safety of those against whom our armed forces are deployed in combat, whether war had formally been declared or not.

The Public Vessels Act does not create new causes of action against the United States. The Act subjects the government to liability in certain cases where a private vessel would be liable. *Allen v. United States,* 338 F.2d 160, 162 (9th Cir.1964), *cert. denied,* 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965). The appellants have found no case where the statute was read to subject the United States to liability for conduct during combat of a warship. This unprecedented and surprising notion, that our warships must exercise reasonable care

toward their targets even as they fire, seems unlikely to have been the intent of Congress and the President when they promulgated the law.

I agree with the majority, that the defense contractors did not owe a duty of reasonable care to those toward whom the weapons they made might be fired.