Jeanette McMAHON, as Personal Representative of the Estate of Michael McMahon; Tracy Grogan, as Personal representative of the estate of Travis Grogan; and Sarah Miller, as Personal Representative of the Estate of Harley Miller, Plaintiffs,

v.

PRESIDENTIAL AIRWAYS, INC., Aviation Worldwide Services, LLC, Sti Aviation, Inc., Air Quest, Inc., and Blackwater Lodge & Training Center, Inc., Defendants.

No. 6:05–CV–1002ORL28JGG.

United States District Court,
M.D. Florida,
Orlando Division.

Jan. 24, 2006.

---

Robert B. Guild, Robert F. Spohrer, Sean B. Cronin, Spohrer, Wilner, Maxwell & Matthews, P.A., Jacksonville, FL, for Plaintiffs.

Douglas R. Beam, Douglas R. Beam, P.A., Melbourne, FL, J. Denny Shupe, Tracey L. Dolin, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, Jonathan M. Stern, Schnader Harrison Segal & Lewis, LLP, Michael P. Socarras, Greenberg Traurig. LLP, Washington, DC, Mark P. Schnapp, Sabrina R. Ferris, Greenberg Traurig, P.A., Miami, FL, for Defendants.

## ORDER

ANTOON, District Judge.

This is a negligence case brought under Florida's Wrongful Death Act by the survivors of three United States soldiers killed while serving in Afghanistan. The case was originally filed in state court, but it was later removed to this Court. Plaintiffs then filed a motion to remand (Doc. 21) to the state court which is presently before the Court for consideration. For the reasons set forth below, the motion is denied.

### I. Background

Plaintiffs Jeanette McMahon, Tracy Grogan, and Sarah Miller initiated this suit by filing a Complaint in the state Circuit Court, Eighteenth Judicial Circuit, in and for Brevard County, Florida. (Doc. 2). In their Complaint, the Plaintiffs bring a claim under the Florida Wrongful Death Act, Sections 768.18–.26, Florida Statutes, asserting that the Defendants' negligence caused the deaths of the Plaintiffs' husbands in an airplane crash in Afghanistan on November 27, 2004. The Defendants allegedly had "contracted with the United States of America ("USA") to provide air transportation and operational support services to the Department of Defense ("DoD") in Afghanistan," (Compl. at 5 ¶ 19), and the Plaintiffs' decedents were American servicemen who were killed when the Defendants' civilian airplane crashed into a mountainside during a non-combat flight, (Pl.'s Mot. to Remand, Doc. 21 at 2 ¶ 1).

In the Complaint, the Plaintiffs allege, inter alia, the following acts of negligence by the Defendants: "[n]egligent failure to use reasonable care by entrusting an aircraft to a flight crew inexperienced in flying the mountainous terrain of Afghanistan" (Compl.¶ 39a); "[n]egligent failure to conduct a formal route study prior to initi-

ating the ... flight" (Compl.¶ 39b); [n]egligent failure to establish a proper flight plan route for the flight (Compl.¶ 39c); [n]egligent failure to create a safe and specific route of flight (Compl.¶ 39d); "[n]egligent failure to properly supervise route planning and flight planning activities" (Compl.¶ 39e); "[n]egligent failure to properly plan and execute the ... flight" (Compl.¶ 39g); "[n]egligent failure to assign a flight crew with adequate experience in flighting a CASA 212 aircraft in mountainous terrain" (Compl.¶ 39k); "[n]egligent failure to assign a flight crew with adequate experience and familiarity with the mountainous terrain and routes of flight to be taken" (Compl.¶ 39*l*); "[n]egligent failure to properly equip the subject aircraft with adequate safety equipment, namely, an enhanced terrain awareness system, a radar altimeter, a global positioning system, and radar equipment" (Compl.¶ 39m); "[n]egligent failure to properly equip the subject aircraft with adequate communications equipment to facilitate flight following" (Compl.¶ 39n); and "[n]egligent failure to warn of the unsafe condition of the aircraft for completing its intended flights" (Compl.¶ 39*o* ).

The Defendants filed a Notice of Removal (Doc. 1) in this Court, asserting that the case was removable on several bases. However, the Plaintiffs then filed the instant Motion to Remand (Doc. 21), contending that their claims "are based upon Florida state law and there is simply no rationale for this Court to exercise federal jurisdiction." (Doc. 21 at 3). The Defendants have responded with an opposition memorandum and several declarations and exhibits (Doc. 24 & Attachs. thereto).

Included in the Defendants' submissions is the Declaration of Timothy Childrey, the Vice President of Defendant Presidential Airways, Inc. ("PAWS"). Mr. Childrey explains in that declaration that PAWS entered into a contract with the United States of America under which PAWS was to provide Short Take–Off and Landing (STOL) Services in support of the Government's military operations in Afghanistan. Attached to Mr. Childrey's Affidavit is the Statement of Work ("SOW") for the contract, which sets forth the contract's scope and requirements.

The Defendants also filed the Declaration of David Dalrymple, PAWS's Site Manager for the STOL program in Afghanistan. (Attach. to Doc. 24). Mr. Dalrymple states in his affidavit that he "attended meetings with senior-ranking [military] officers of the Combined/Joint Task Force 76 at which [they] discussed the operations that [PAWS] would be performing." (Dalrymple Decl. at 1 ¶ 3). According to Mr. Dalrymple, they "discussed the risks and benefits of flying the existing airway structure, which required flight at higher altitudes, or flying down low, principally in" two valleys. (*Id.*). Dalrymple "was advised that the military wanted us to fly the lower altitudes to the extent practicable to avoid the wear and tear on personnel and fatigue that would result from flying in the high teens in the unpressurized aircraft in which we began operations. Flying at the lower altitudes also meant that the airplanes would have greater useful loads." (*Id.* ¶ 4). Mr. Dalrymple further explains in his declaration the process by which PAWS was assigned to fly Joint Mission Requests under the contract. (*Id.* at 2). "A request/tasking for airlift would originate within a military unit," and PAWS "would be directed what type of aircraft to fly (Metro or CASA), when to depart, where to fly, and who and what to carry." (*Id.* at 2 ¶¶ 13 & 15).

A third declaration submitted by Defendants is that of John Hight, PAWS's Director of Operations who was in Afghanistan when PAWS began its operations under the contract in September

2004. (Attach. to Doc. 24). Mr. Hight explains that "[w]hile there was a formal airway structure in Afghanistan, the navigation aids that defined the airways were all, or mostly all, inoperative and the airways themselves—unlike their counterparts in the United States—ensured neither terrain clearance nor the ability to communicate with an air traffic control facility." (Hight Decl. at 1 ¶ 3). "[T]he bulk of [Afghanistan] was comprised of uncontrolled airspace." (*Id.*).

Mr. Hight states that "at the onset of operations of Afghanistan" he and Mr. Dalrymple "met with [military] officers of the United States ... to discuss, and we agreed upon, routes that [PAWS] would fly in performing missions under the" contract. (*Id.* at 1 ¶ 5). These agreed-upon routes "consisted principally of the valleys that ran long distances through Afghanistan" and "[t]he decision to fly these routes involved tradeoffs of risk that were discussed with the military and agreed upon." (*Id.*). "One obvious risk was that the airplanes would cruise below the peaks of surrounding mountains," while "[s]ome of the benefits were that the airplanes would be less likely to encounter hostile fire because they would not fly the same predictable paths day-in and day-out, they would avoid flight at higher altitudes that would be fatiguing to crew and passengers alike, and they would permit heavier loads to be carried greater distances." (*Id.*). Mr. Hight also notes that PAWS "planned to maintain communication with [its] aircraft while on missions using satellite telephones" provided by the United States under the contract, but the phones "often did not perform well in the field and that communication in Afghanistan was very difficult"; as noted by Mr. Hight, the contract contemplated that communication might not always be possible. (*Id.* ¶ 6; SOW at 3 ¶ 1.9).

## II. Discussion

■ Although often the movant bears the burden of establishing entitlement to the relief sought in its motion, where the subject motion seeks to remand a removed case it is not the moving party but the removing party who "bears the burden of showing the existence of federal jurisdiction." *Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir.1998); *accord Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir.1996). Thus, in order to defeat the Plaintiffs' motion to remand, the Defendants must "produc[e] facts supporting the existence of federal subject matter jurisdiction by a preponderance of the evidence." *Hobbs v. Blue Cross Blue Shield of Ala.*, 276 F.3d 1236, 1242 (11th Cir. 2001).

■ "An action filed in state court may be removed to federal court based upon diversity or federal question jurisdiction." *Pacheco de Perez*, 139 F.3d at 1373; *see also* 28 U.S.C. § 1441(a) (providing, with certain exceptions, that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction[ ] may be removed by the defendant or the defendants[ ] to the district court of the United States for the district and division embracing the place where such action is pending"). "Diversity will not support removal jurisdiction, however, if any of the properly joined defendants are citizens of the state in which the suit was originally filed." *Pacheco de Perez*, 139 F.3d at 1373; *see* 28 U.S.C. § 1441(b) (providing that actions that are not based on a federal question "shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought"). Thus, although the parties in the instant case apparently are completely diverse, it is undisputed that removal was not proper on the basis

of diversity of citizenship because the Defendants are Florida residents.[1] In order for this case to remain in this Court, therefore, some other, sustainable basis for removal must be present.

■ The Defendants maintain that this case involves a federal question and therefore was properly removed from state court. In their response to the motion for remand, they assert three alternative bases for federal question jurisdiction. First, they contend that removal was proper under the federal officer removal statute, 28 U.S.C. § 1442, because one of the Defendants, PAWS, was acting under the direction of a federal officer. Second, the Defendants aver that the Plaintiffs' state law claims are completely preempted by federal law and thus "aris[e] under the Constitution, laws, or treaties of the United States." See 28 U.S.C. § 1331. Finally, as their third basis for federal question jurisdiction, the Defendants assert that even if the Plaintiffs' claims are not completely preempted by federal law, the claims turn on substantial questions of federal law. The sufficiency of each of these bases for jurisdiction is addressed in turn.

*A. Federal Officer Removal*

Section 1442 of Title 28, United States Code, provides in part:

A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . .

28 U.S.C. § 1442(a)(1). The Defendants assert that Defendant PAWS was a "person acting under [an officer] of the United States" in connection with the events giving rise to this suit and that therefore this case was properly removed to this federal district court under this statutory provision.

■■ As the Eleventh Circuit has explained, Section 1442 makes the right of removal " 'absolute whenever a suit in a state court is for any act "under color" of federal office, regardless of whether the suit could originally have been brought in a federal court.' " *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir.1996) (quoting *Willingham v. Morgan*, 395 U.S. 402, 406, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969)). "If the statutory prerequisites are satisfied, section 1442(a)(1) provides an independent federal jurisdictional basis." *Id.* Thus, although ordinarily removal cannot be based merely on the presence of "an anticipated or actual federal defense," "[u]nder the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999); *see also Mesa v. Calif.*, 489 U.S. 121, 136, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) ("[I]t is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art[icle] III purposes. The removal statute itself merely serves to overcome the 'well-pleaded complaint rule' which would other-

---

1. *See* Defs.' Mem. in Opp'n to Mot. to Remand, Doc. 24 at 7; *see also* Notice of Removal, Doc. 1 at 3 n. 2 ("The defendants acknowledge that, despite satisfaction of the requisites to diversity of citizenship jurisdiction, removal solely on this basis is not permissible because four of the defendants are deemed citizens of Florida.").

wise preclude removal even if a federal defense were alleged."). Moreover, while removal provisions are usually construed narrowly, *see, e.g., Diaz v. Sheppard,* 85 F.3d 1502, 1505 (11th Cir.1996), the federal officer provision is "not 'narrow' or 'limited,'" but instead "is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Willingham v. Morgan,* 395 U.S. 402, 406–07, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969).

■ Although there are varying formulations of the test for removal under the federal officer provision, one cogent statement of the requirements for private parties seeking the benefit of this section is set forth in *In re Methyl Tertiary Butyl Ether Products Liability Litigation,* 342 F.Supp.2d 147, 154 (S.D.N.Y.2004): "Under Section 1442, a private party may remove a state court action if (1) it acted under the direction of a federal agency or officer; (2) it has a colorable federal defense; and (3) there is a causal nexus between the federal direction and the conduct in question." *Accord McCormick v. C.E. Thurston & Sons, Inc.,* 977 F.Supp. 400, 403 (E.D.Va.1997) (citing *Mesa v. Calif.,* 489 U.S. 121, 124–25, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)); *see also Watson v. Philip Morris Cos.,* 420 F.3d 852, 855, 863 (8th Cir.2005) (listing these three requirements along with a fourth—that the defendant be a "person" within the meaning of Section 1442—and noting that courts have held that corporations satisfy the "person" requirement). Because, as set forth below, the Defendants have satisfied the Court that PAWS meets each of these elements, removal under Section 1442(a)(1) is proper in this case.

*1. Under the Direction of a Federal Agency or Officer*

■ First, the Defendants have sufficiently shown, for the purpose of re-

moval, that PAWS acted under the direction of a federal officer. "A defendant meets the first requirement of 'acting under the direction of a federal agency or officer' by 'showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations.'" *In re Methyl,* 342 F.Supp.2d at 154 (quoting *Ryan v. Dow Chem. Co.,* 781 F.Supp. 934, 946–47 (E.D.N.Y.1992)); *see also Watson,* 420 F.3d at 856–57 ("Whether a defendant is 'acting under' the direction of a federal officer depends on the detail and specificity of the federal direction of the defendant's activities and whether the government exercises control over the defendant."). "[T]here is 'no precise standard for the extent of control necessary to bring an individual with[in] the "acting under" clause,'" but Section 1442(a)—and its "persons acting under" provision in particular—"'has been construed broadly.'" *In re Methyl,* 342 F.Supp.2d at 154–55 (citations omitted).

The Defendants persuasively assert that PAWS was "acting under an officer of the United States." The contract between the Government and PAWS contains express requirements regarding crew qualifications and equipment, as well as provisions regarding communications and recognition that in-flight communication would not always be possible. The Defendants also note that Plaintiffs have made allegations regarding negligence with respect to route selections, *see* Compl. ¶ 39, and Defendants have presented evidence supporting their contentions that route determinations were made in meetings with Department of Defense personnel (*see* John Hight Decl., Attach. to Doc. 24). The provisions of the contract describe control by the Government over the way in which PAWS was to perform the contract, and indeed it seems likely that the Government would not allow

transportation of military personnel and ammunition as in this circumstance without retaining a significant amount of control over the operation. Although the Plaintiffs assert that "[o]fficers of the United States did not directly control the actions of the aircraft when the [Plaintiffs' decedents] lost their lives in the Afghan mountains," (see Doc. 21 at 13), this argument misses the mark. The allegations of the Complaint include assertions of negligence regarding equipment, routes, and other seemingly relevant aspects of the contract as to which evidence of more than vague Governmental control has been presented. See, e.g., Watson, 420 F.3d at 857 ("Courts have found private actors, working under government contracts, to be acting under the direction of a federal officer where the government maintained control over the manner in which the contractor performed the contracted work or monitored the performance of the work."). The Defendants have met this first prong of the federal officer removal standard.

### 2. Colorable Federal Defense

 Second, the Defendants have satisfied the "colorable federal defense" requirement for federal officer removal. PAWS has asserted several federal defenses—the Government Contractor Defense ("GCD"), the Combat and Foreign Country Exceptions to the Federal Tort Claims Act (" FTCA") (28 U.S.C. § 2680(j), (k)), and the Feres [2] doctrine. It is important to bear in mind that "[a]t this stage of the litigation, there is no need to decide whether defendants will prevail on [any] of these defenses. The only issue is whether one or [more] of these defenses is colorable." In re Methyl, 342 F.Supp.2d at 158; accord Jefferson County, Ala. v. Acker, 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999) ("In construing the colorable federal defense requirement, we

have rejected a 'narrow, grudging interpretation' of the statute ... [and] do not require the officer virtually 'to win his case before he can have it removed.' ") (quoting Willingham v. Morgan, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969)); Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424, 1427 (11th Cir.1996) (noting that the "defense need only be plausible; its ultimate validity is not to be determined at the time of removal").

The first federal defense asserted by PAWS is the GCD. In Boyle v. United Technologies Corp., 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the United States Supreme Court described the elements of this defense in the context of military equipment design defects by stating that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."

The Eleventh Circuit has endorsed the application of the GCD to a case involving alleged negligent maintenance of a helicopter. In Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329 (11th Cir.2003), two Army helicopter pilots were injured in a crash and filed suit against the helicopter manufacturer for failure to properly maintain or repair the helicopter. The district court granted summary judgment to the defendant based on the GCD, and the Eleventh Circuit affirmed, approving the applicability of the GCD in the maintenance contract context. The Hudgens court noted:

Although Boyle referred specifically to procurement contracts, the analysis it

---

**2.** Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

requires is not designed to promote all-or-nothing rules regarding different classes of contract. Rather, the question is whether subjecting a contractor to liability under state tort law would create a significant conflict with a unique federal interest. We would be hard-pressed to conclude that the unique federal interest recognized in *Boyle*, as well as the potential for significant conflict with state law, are not likewise manifest in the present case. The formulation of design specifications and the articulation of maintenance protocols involve the exercise of the very same discretion to decide how a military fleet of airworthy craft will be readied. Holding a contractor liable under state law for conscientiously maintaining military aircraft according to specified procedures would threaten government officials' discretion in precisely the same manner as holding contractors liable for departing from design specifications.

328 F.3d at 1334 (citation omitted). The contract at issue here is sufficiently analogous to that at issue in *Hudgens* to warrant potential application of the GCD as well.

Having determined that the GCD is potentially applicable in the context of the contract involved in this case, the Court also finds that the Defendants have presented a colorable case for the assertion of the GCD by PAWS, which, again, is all that is required at the removal stage. First, the Defendants have presented evidence that the Government approved or directed reasonably specific routes and other specifications in connection with the STOL operations. As noted in *Hudgens*, "[t]he reasonable precision requirement ensures that the government contractor defense is limited to its proper scope by requiring 'that the design feature in question was considered by a Government officer, and not merely the contractor itself.'" 328 F.3d at 1335 (quoting *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510). The Defendants have asserted, and have presented supporting evidence, that the specifications for the flights under the contract—including the flight that is the subject of this suit—were considered by the Government and not merely by PAWS. Second, the Defendants plausibly contend that PAWS conformed to the Government's directives—i.e., that the plane flew where it flew, in the manner that it flew, and using the personnel and equipment that were used—pursuant to the Government's needs and directives. Finally, the Defendants have asserted that PAWS advised the Government of dangers known to PAWS but not the Government. Thus, the Defendants have satisfied the "colorable federal defense" requirement for officer removal by asserting the GCD.

 The second federal defense asserted by PAWS is the Combat Exception to the FTCA, which provides that the FTCA does not apply to "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). Although this exception is expressly applicable to claims under the FTCA, "[t]he Supreme Court has recognized that the exceptions to the FTCA may preempt common law tort actions against defense contractors under certain circumstances." *Koohi v. United States*, 976 F.2d 1328, 1336 (9th Cir.1992) (citing *Boyle*).

The Defendants are correct that PAWS has a colorable defense under this FTCA exception. "The [combatant activities] exception seems to represent Congressional acknowledgment that war is an inherently ugly business for which tort claims are simply inappropriate." *Ibrahim v. Titan Corp.*, 391 F.Supp.2d 10, 18 (D.D.C.2005). The "time of war" language within the exception has been construed broadly, and

an express declaration of war is not required. *See, e.g., Koohi,* 976 F.2d at 1335 ("[W]e have no difficulty in concluding that when, as a result of a deliberate decision by the executive branch, United States armed forces engage in an organized series of hostile encounters on a significant scale with the military forces of another nation, the FTCA exception applies. Under those circumstances, a 'time of war' exists, at least for purposes of domestic tort law."). Moreover, it has been held that "[t]he act of supplying ammunition to fighting vessels in a combat area during war is undoubtedly a 'combatant activity.'" *Johnson v. United States,* 170 F.2d 767, 770 (9th Cir.1948). On the flight at issue here, ammunition and troops were being transported during what can fairly be characterized as organized military operations in Afghanistan. Thus, the definitions of "combatant activities" and "time of war" appear to be satisfied here, and the Defendants have raised a colorable defense under Section 2680(j) of the FTCA.

PAWS's third alleged federal defense is the Foreign Country Exception to the FTCA, which provides that the FTCA does not apply to "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). Although the Defendants mention this defense in their opposition memorandum (Doc. 24 at 11), they do not make any argument supporting its applicability. A cursory review of case law regarding this exception reflects that its purpose is to protect the Government from being subjected to the laws of a foreign jurisdiction. *See, e.g., Pignataro v. United States,* 172 F.Supp. 151, 152 (E.D.N.Y.1959) ("The test in determining whether a claim is excluded by section 2680(k) is whether the place in which it arose was territory subject to the sovereignty of another nation, and whether the liability asserted is one depending on the laws of a foreign power."). In light of the Defendants' failure to expound upon the applicability of this defense and the fact that no issue of foreign law has yet been raised in this case, the Court declines to hold that the "foreign country" exception presents a colorable defense for the purpose of federal officer removal in this case.

Finally, the Defendants assert the *Feres* doctrine as a colorable federal defense. However, as with the foreign country exception discussed in the preceding paragraph, the Defendants do not elaborate on the applicability of the *Feres* doctrine as a potential defense in this case. Moreover, in *Boyle,* the Supreme Court "rejected this *Feres* doctrine as the ideological source of the government contractor defense in part because the doctrine would produce results that are in some respects too broad." *Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242, 245 n. 3 (5th Cir.1990); *see also Boyle,* 487 U.S. at 510–11, 108 S.Ct. 2510.

In sum, the Court finds that Defendants have presented two colorable federal defenses—the GCD and the combat exception to the FTCA. However, in light of the Defendants' failure to persuade the Court with respect to the foreign country exception to the FTCA and the *Feres* doctrine, the Court declines to find either of those two defenses colorable for removal purposes.

### 3. Causal Nexus

■ Finally, the Court is satisfied that there is a causal nexus between the federal direction given to PAWS and the conduct in question. The flight at issue here involved the transportation of servicemen and ammunition pursuant to the contract with the United States military, and included in the Plaintiffs' allegations are assertions that the Defendants performed negligently in several areas addressed in the contract and in concomitant discussions. A causal nexus is thus apparent.

### 4. Conclusion as to Federal Officer Removal

The Defendants have met their burden of showing a basis for removal under 28 U.S.C. § 1442. They have satisfied the court, at this stage of the case, that PAWS acted under the direction of a federal officer, that PAWS has two colorable federal defenses, and that there is a causal nexus between the federal officer's direction and the conduct at issue.

### B. Complete Preemption

The Defendants also contend that removal of this case to federal court was proper because the Plaintiffs' state law tort claims are completely preempted by federal law. The Defendants argue that the Plaintiffs' claims under Florida's Wrongful Death Act are preempted because this suit is based on events involving the Defendants' performance of functions traditionally performed by the military in a war region. The Defendants note Congress's enactment of the FTCA and application of the FTCA to government contractors.

 Complete preemption "is a narrowly drawn jurisdictional rule for assessing federal removal jurisdiction when a complaint purports to raise only state law claims." *Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1353 (11th Cir.2003). "It looks beyond the complaint to determine if the suit is, in reality, 'purely a creature of federal law,' even if state law would provide a cause of action in the absence of the federal law. It transforms the state claim into one arising under federal law, thus creating the federal question jurisdiction requisite to removal to federal courts." *Id.* (citations omitted).

 "Complete preemption occurs when federal law so occupies a given field that a state-law claim is transformed into a claim 'arising under' federal law. In other words, 'if a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily "arises under" federal law.'" *Dunlap v. G & L Holding Group Inc.*, 381 F.3d 1285, 1290 (11th Cir.2004) (citations omitted).

Complete preemption as a basis for removal has been found only in only rare cases-usually in cases involving federal statutes that cover the same subject matter as the state law under which the suit is brought. *See, e.g., Geddes*, 321 F.3d at 1353 ("The Supreme Court and th[e Eleventh] Circuit have found complete preemption only under section 301 of the Labor Management Relations Act ... and section 502 of the Employee Retirement Income Security Act ...."). However, courts have held state law tort claims "preempted" by federal law in situations involving military contractors. For example, in *Boyle*, the Supreme Court, in endorsing the GCD, held "that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced." 487 U.S. at 512, 108 S.Ct. 2510. This statement in *Boyle* was not, however, made in the removal context, and the GCD is fact-dependent.

This case involves novel circumstances and is still in its very early stages. Issues as to what law applies to the Plaintiffs' claims will, in all likelihood, ultimately be significant. However, in light of the strength of the Court's convictions as to its rulings herein regarding other bases for federal question jurisdiction in this case, as well as the overlap among the asserted bases, it is unnecessary to resolve the issue of "complete preemption" at this point.

### C. Substantial Questions of Federal Law

 The Defendants also argue that even if the Plaintiffs' state law claims are

not completely preempted by federal law, they raise substantial questions of federal law that also support removal jurisdiction. On this point, the Defendants are correct.

"There is ... another longstanding ... variety of federal 'arising under' jurisdiction, t[he Supreme Court] having recognized for nearly 100 years that in certain cases federal question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* —— U.S. ——, —— - ——, 125 S.Ct. 2363, 2366–67, 162 L.Ed.2d 257 (2005). "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 2367.

"[A] request to exercise federal-question jurisdiction over a state action calls for a 'common-sense accommodation of judgment to [the] kaleidoscopic situations' that present a federal issue, in 'a selective process which picks the substantial causes out of the web and lays the other ones aside.'" *Id.* (quoting *Gully v. First Nat'l Bank in Meridian,* 299 U.S. 109, 117–18, 57 S.Ct. 96, 81 L.Ed. 70 (1936)). "It has in fact become a constant refrain in such cases that federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Id.; accord Dunlap v. G & L Holding Group Inc.,* 381 F.3d 1285, 1290 (11th Cir. 2004) (" 'The mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction.' In other words, the state-law claim must 'really and substantially involved[ ] a dispute or controversy respecting the validity, construction or effect of

[federal] law.' ") (quoting *Merrell Dow Pharms., Inc. v. Thompson,* 478 U.S. 804, 813, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) and *Mobil Oil Corp. v. Coastal Petroleum Co.,* 671 F.2d 419, 422 (11th Cir.1982)).

The state-law claims at issue in this case clearly raise substantial contested federal issues that support removal jurisdiction. In *Boyle,* the Supreme Court concluded that "the civil liabilities arising out of the performance of federal procurement contracts" implicated a "uniquely federal interest," 487 U.S. at 506–07, 108 S.Ct. 2510, and the contract at issue here does likewise. As the *Boyle* Court noted: "The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected." 487 U.S. at 507, 108 S.Ct. 2510. In the instant case, issues involving a government contract and United States military operations are implicated, and substantial contested federal issues are apparent.

■ The presence of a substantial federal question is not the end of the jurisdictional inquiry, however. Even when such a question exists in a state court action, "the exercise of federal jurisdiction is subject to a possible veto"; "the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Grable,* 125 S.Ct. at 2367. The pertinent inquiry is whether "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 2368.

This case presents no danger of interference with the balance between federal and state judicial responsibilities. As noted above, the federal issues are quite substantial and exercise of jurisdiction by this federal district court does not offend the traditional state-federal judicial balance. Thus, removal jurisdiction is properly based on the presence of substantial federal questions in this suit.

### III. Conclusion

The Plaintiffs' assertion that "no federal issue is in dispute" in this case is not well-taken. The Defendants have met their burden of presenting a basis for federal question jurisdiction in this case. Accordingly, it is **ORDERED** and **ADJUDGED** that Plaintiffs' Motion to Remand (Doc. 21) is **DENIED**.